UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 15-2206, 15-2217, 15-2230, 15-2234, 15-2272, 15-2273,
15-2290, 15-2291, 15-2292, 15-2294, 15-2304, and 15-2305
_____

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS CONCUSSION
INJURY LITIGATION

Cleo Miller; Judson Flint; Elmer Underwood; Vincent Clark, Sr.;
Ken Jones; Fred Smerlas; Jim Rourke; Lou Piccone;
James David Wilkins, II; Robert Jackson,

Appellants in 15-2217

(E.D. Pa. No. 2-12-md-02323)
_____

**BRIEF OF APPELLANTS**

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
Anita B. Brody, District Judge

_____

John J. Pentz
19 Widow Rites Lane
Sudbury, MA 01776
T: 978.261.5725
F: 978.405.5161
jjpentz3@gmail.com

# TABLE OF CONTENTS

Table of Contents…………………………………………………...…….2

Table of Authorities……………………………………………..……..…2

Statement of Jurisdiction…………...…………………………………….4

Statement of the Issues .................................. …………………..……….....4

Related Cases and Proceedings....................................................................5

Statement of the Case…………………………………………………….6

Statement of the Facts…………………………………………………7

Summary of Argument…………………………………….…..…..……10

Argument……………………………………………………………....12

I.    The District Court Abused Its Discretion By Approving
A Settlement That Treats Identically Situated Class Members
Differently Based Upon an Arbitrary Cutoff Date...........................12

    A.    Standard of Review...................................................12

    B.    There is No Adequate Class Representative For Class
Members Who Have Not Yet Been Diagnosed With
A Compensable Disease, But Will Be Diagnosed With
CTE in the Future....................................................12

    C.    The Settlement Makes Essential Allocation Decisions
Among Different Kinds of Plaintiffs........................................16

    D.    There is No Permissible Basis For The Differential
Treatment of Identically Situated CTE Class
Members...................................................................19

    E.    The Discriminatory Treatment of Class Members
Who Die With CTE After April 22, 2015 Requires
Reversal...................................................................24

      F.     CTE Claims Should Have Been Carved
             Out Of This Settlement............................................................26

Conclusion………………………………………………………………….31

Certifications.................................................................................................32

Certificate of Service....................................................................................33

## TABLE OF AUTHORITIES

page

*Amchem Prods. v. Windsor,* 521 U.S. 591 (1997)....................10,12,13,18,25

*Dewey v. Volkswagen Aktiengesellschaft,*
681 F.3d 170 (3rd Cir.2012)..............................................................6, 9,17,24

*Georgine v. Amchem Prods. Inc.*, 83 F.3d 610 (3rd Cir. 1996)................16,

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 295 (3rd Cir. 2011).........12

## STATEMENT OF JURISDICTION

1.  **District Court's Jurisdiction.**  The District Court had jurisdiction over this case under 28 U.S.C. §1332(d) based upon diversity of citizenship, and because the total amount in controversy exceeds $5,000,000.

2.  **Appellate Jurisdiction.**  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  The district court entered its order and final judgment on April 22, 2015.  A. 40.  Appellants filed their Notice of Appeal on May 14, 2015.  A. 4.

## STATEMENT OF ISSUES

1.  Did the district court abuse its discretion by approving a settlement that favors the currently injured over those class members who have been merely exposed to head trauma but whose injuries have not yet manifested?  This issue was raised in Appellants' Objections and at the Fairness Hearing.  Docs. 6213, 6452, 6484, A. 5402 - A. 5460.  It was overruled in the district court's opinion. A. 58.

2.  Did the district court err as a matter of law by certifying a class that includes persons who currently have no ripe Article III claims against the NFL?  This issue was raised in Appellants' Objections and at the

Fairness Hearing.  Docs. 6213, 6452, 6484, A. 5402 - A. 5460.  It was overruled in the district court's opinion. A. 58.

3.      Did the district court abuse its discretion by approving a settlement that treats identically situated class members differently based upon an arbitrary cutoff date for Death with CTE?  This issue was raised in Appellants' Objections and at the Fairness Hearing.  Docs. 6213, 6452, 6484, A. 5402 - A. 5460.  It was overruled in the district court's opinion. A. 58.

## RELATED CASES AND PROCEEDINGS

This appeal has been consolidated with eleven other appeals from the district court's approval order.   This case was before this Court previously on an appeal of preliminary approval. *See In re National Football League Players Concussion Injury Litigation,* 775 F.3d 570 (3rd Cir. 2014).

Several other appeals have been filed from the district court's settlement approval.  Nos. 15-2206, 15-2217, 15-2230, 15-2234, 15-2272, 15-2273, 15-2290, 15-2292, 15-2294, 15-2304, 15-2305. The Court consolidated the appeals in an order entered on June 16, 2015.

## STATEMENT OF THE CASE

This appeal arises from the settlement of a class action lawsuit against the NFL by a class of retired NFL players for injuries caused by traumatic brain injury sustained while playing in the NFL.  The centerpiece of this litigation when it was filed was the condition known as Chronic Traumatic Encephalopathy, or CTE, the disease that is commonly referred to as the "industrial disease" of the NFL.  Of the 79 former NFL players who have had their brains autopsied following their deaths, 76 were found to have evidence of CTE.  A. 138, A. 5416.

Over the course of the litigation, Class Counsel, despite having alleged claims for personal injury related to CTE in the complaints, lost confidence in the viability of the CTE diagnosis, conceding that the science on CTE was too immature to support recovery for class members suffering from that condition.  Rather than amending the class definition or deleting the CTE claims from the complaint, however, Class Counsel proceeded to settle those claims for no compensation, while obtaining recovery for other, rarer, conditions that are not exclusively associated with head trauma.  Class Counsel explicitly conceded that this tradeoff had taken place, and that releasing all future CTE claims for no compensation had been traded for enhanced compensation for Alzheimer's, Parkinson's Disease and ALS.  A.

3860 ("Expanding the settlement to include CTE would have meant making cuts elsewhere, such as abandoning coverage for ALS, Alzheimer's Disease, or Parkinson's Disease.").

Appellants, along with many other class members, objected to the settlement on the grounds that it improperly releases the unripe CTE claims for no consideration, uses the unripeness of the CTE claims as the justification for their release for no consideration, and treats similarly situated class members differently based upon an arbitrary deadline for Death with CTE claims.  The district court approved the settlement over these objections on April 22, 2015. A. 58.  Appellants filed their Notice of Appeal on May 14, 2015.  A. 4.

## STATEMENT OF FACTS

This class action was brought by a class of retired players for injuries caused by head trauma suffered while playing in the NFL.  The centerpiece of this action when it was filed was a claim for compensation for Chronic Traumatic Encephalopathy, or CTE, a disease which, as of the writing of this Brief, can only be diagnosed through an autopsy.  Class Counsel knew when they filed this lawsuit that there was no way of proving that a former player had CTE while that player was living. Nevertheless, despite this enormous defect in their case for CTE, Class Counsel alleged claims for relief related

to CTE for *all* retired players, not just on behalf of those who had died by the time of filing.

Indeed, the main reason why the issue of the danger of concussions in the NFL had come to prominence was the high-profile suicides of former players such as Junior Seau and Dave Duerson, whose brains were later found to have the marker of CTE during autopsy. These high profile deaths brought unprecedented media attention to the danger of repeated concussions and the disease of CTE that had previously gone underreported. This media spotlight, in turn, led to the filing of this class action lawsuit seeking compensation for the debilitating symptoms of CTE, including the symptom of suicidality that characterizes CTE.

The lawsuit also made claims for other diseases associated with head trauma, including Parkinson's Disease, Alzheimer's, and ALS, even though these diseases affect a far smaller number of retired players than CTE does, and also afflict many people who never suffered head trauma. A. 691. Moreover, only *one* of these diseases was represented by a Lead Plaintiff – Kevin Turner suffered from ALS at the time he filed this lawsuit. There is no Lead Plaintiff suffering from Parkinson's Disease, Alzheimer's, Level 1.5 or Level 2 Dementia, or CTE. Shawn Wooden, the only other Lead Plaintiff

besides Kevin Turner, currently claims to be suffering from no compensable condition, but alleges that he may develop CTE in the future.  A. 5360.

As the Plaintiffs and the NFL argued vociferously at the fairness hearing, the Plaintiffs never had any realistic chance of prevailing on their CTE claims on behalf of living players, because the science on CTE is too nascent and undeveloped.  Only deceased players can be diagnosed with CTE.  Therefore, Class Counsel filed this case knowing they had no chance of prevailing on the CTE claims, but filed them anyway as a bargaining chip to trade away in settlement negotiations for enhanced compensation of other diseases that will affect a small minority of class members.

In 2014, the parties entered into a settlement of the claims alleged in this litigation that compensates five defined conditions at set dollar amounts that decline as the age at which the former player is diagnosed goes up, and also vary depending on years played in the NFL.  A. 1497.  The covered conditions are Parkinson's, Alzheimer's, ALS and Level 1.5 and Level 2 Cognitive Impairment.  A. 1507.  CTE is compensated only for those former players who died prior to the date of settlement, July 7, 2014, a date which was later moved to the date of the district court's approval order, April 22, 2015.  A. 1466.

Only a small percentage of class members are expected to qualify for compensation for the five diseases other than CTE. The NFL and Class Counsel have estimated that the total number of class members who will qualify for payment is 3488 of the 20,500 former players in the class. A. 1738. The vast majority of class members, however, will probably die with evidence of CTE in their brains. The settlement only compensates a handful of such players -- those who died prior to April 22, 2015.

## SUMMARY OF ARGUMENT

The approved settlement impermissibly treats similarly situated class members differently based solely upon an arbitrary cutoff date for Death with CTE compensation, and releases the future, unripe CTE claims of the majority of the class for no consideration. Because the study of CTE is "nascent" and "in its infancy," as the district court found, the class' CTE claims should not have been released at this time. Indeed, because CTE cannot currently be diagnosed except by autopsy of the brain, the CTE claims of all living class members are not yet ripe, since their claims do not arise until diagnosis.

The settlement favors the currently injured over those class members who have been merely exposed to head trauma, but whose injuries have not yet manifested, as in *Amchem Prods. v. Windsor,* 521 U.S. 591 (1997).

Indeed, the parties acknowledged that the settlement is a result of tradeoffs in which certain diseases such as ALS and Alzeheimer's received greater compensation in exchange for Class Counsel's agreement to release all future claims for CTE for no consideration.

As in *Amchem*, those class members, like Kevin Turner, who are currently suffering from a diagnosable condition favor generous immediate relief, while those, like the Appellants, and 19,000 other absent class members who have not yet been diagnosed with a compensable condition, would prefer no settlement at all over the release of their potential future claims for no consideration.

Class Counsel should have filed this case on behalf of only those former players who are currently suffering from a "well-defined and robustly studied condition," and should have left out claims for the undeveloped and immature condition known as CTE.  It is the height of hypocrisy for the parties to defend a settlement that offers nothing for CTE to the vast majority of class members by arguing that those claims could not prevail at trial because the science is too new.  That is a reason for *not bringing the claims at all*, not for trading them away for no consideration so that other class members suffering from ALS and Alzheimer's can get paid more today.

# ARGUMENT

I.  **The District Court Abused Its Discretion By Approving A Settlement That Treats Identically Situated Class Members Differently Based Upon an Arbitrary Cutoff Date.**

   A.   **Standard of Review.**

A district court's approval of a class action settlement is reviewed for abuse of discretion.  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 295 (3rd Cir. 2011).  Whether the lower court used the correct legal standard is reviewed *de novo*.  *Id.*  Here, the district court applied the incorrect legal standard, which means that this Court's review is plenary.  L.A.R. 28.1(b)

   B.   **There is No Adequate Class Representative For Class Members Who Have Not Yet Been Diagnosed With A Compensable Disease, But Will Be Diagnosed With CTE in the Future.**

The settlement favors currently injured class members at the expense of those who will die or be diagnosed with CTE in the future.  Therefore, it fails the adequacy test set forth in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and must be rejected.  The named plaintiffs and other class members seeking to maximize immediate compensation do not share the same interests as those players whose symptoms have yet to fully manifest, or whose future deaths may be found to be related to CTE.

> [N]amed parties with diverse medical conditions sought to act
> on behalf of a single giant class rather than on behalf of discrete
> subclasses.  In significant respects, the interests of those within

> the single class are not aligned.  Most saliently, for the currently injured, the critical goal is generous immediate payments.  That goal tugs against the interest of exposure-only plaintiffs...

*Id*. at 626.

Here, the conflict between those currently injured and those whose diseases will manifest in the future is starker than it was in *Amchem*.  Players who have already died with a diagnosis of CTE before April 22, 2015 are eligible to receive up to $4 million.  Players who will die after April 22, 2015 with the exact same diagnosis will receive *nothing*, while releasing all of their claims.  This is clear evidence of the named plaintiffs' inadequacy, since an adequate named plaintiff would have perceived the clear unfairness of such a settlement, and advocated for treating similarly situated class members the same.

The settlement is, of course, relevant to the question of adequacy of representation:

> We agree with petitioners to this limited extent: settlement is relevant to class certification... the Court of Appeals in fact did not ignore the settlement; instead, that court homed in on settlement terms in explaining why it found the absentees' interests inadequately represented.

*Id*. at 619.  The settlement in this case illustrates the inadequacy of representation, in that the settlement leaves all class members who will die with CTE in the future uncompensated, while paying those that have already

died with the same condition up to $4 million. That smacks of a tradeoff of high current payouts in exchange for very low (or non-existent) payouts to future claimants, whose interests were easily sacrificed since no party in the case was looking out for them.

Neither of the two named class representatives in this case adequately represents those class members who have yet to develop a disease caused by traumatic brain injury, but who will develop CTE in the future. Kevin Turner, who currently suffers from ALS and stands to receive millions of dollars under the settlement his counsel negotiated on his behalf, cannot possibly adequately represent former players who have yet to develop a diagnosable condition, and in particular those who will be diagnosed with CTE only after their deaths.

Shawn Wooden, who currently claims to suffer from no disease caused by repetitive head trauma, cannot be an adequate class representative for those class members who have been diagnosed with CTE after their deaths, or for those who will be diagnosed with CTE in the future through autopsy of their brains. The parties have argued strenuously that CTE can only be diagnosed *post-mortem*. Therefore, the only adequate representative for the CTE subclass is the representative of one of the 33 deceased former

NFL players whose brains were studied after death and were found to have CTE protein patterns.

The estate of a deceased player found to have CTE *post-mortem* would be the most adequate representative plaintiff for the CTE subclass, including those former players who are still alive but will be diagnosed with CTE after their deaths. While the estate of a deceased former player with CTE would not be *the ideal* representative plaintiff for the living players, since there would still be a potential conflict between immediate and future payouts, such a plaintiff would be the best representative possible, and be far preferable to the indifferent Shawn Wooden, who allowed himself to be used by Class Counsel to whitewash this travesty of a settlement.

The estate of a deceased player diagnosed with CTE *post-mortem* would be expected to advocate for the maximum recovery for all players diagnosed with CTE at any time during the settlement period. There is no reason to expect that such a plaintiff would ever have agreed to an arbitrary cutoff for CTE compensation. For example, had the estate of Dave Duerson been appointed as the representative plaintiff on behalf of the CTE subclass, Duerson's estate would have argued forcefully for compensation of all former players who are diagnosed with CTE during autopsy, as they did as an objector at the November 2014 fairness hearing. A. 5457. The estate of

Dave Duerson would have been a far more adequate named plaintiff than

Shawn Wooden, and would have refused to sign off on the settlement that

treats similarly situated class members differently based upon an arbitrary

date.

> **C.    The Settlement Makes Essential Allocation Decisions
> Among Different Kinds of Plaintiffs.**

As in *Georgine v. Amchem Prods. Inc.*, 83 F.3d 610 (3rd Cir. 1996),

the settlement approved by the district court "does more than simply provide

a general recovery fund.  Rather, it makes important judgments on how

recovery is to be allocated among different kinds of plaintiffs, decisions that

necessarily favor some claimants over others."  *Id*. at 630.  *Georgine*

involved a settlement that purported to bind a class of all persons who had

been exposed to asbestos.  Class members who had already developed

asbestos-related diseases were entitled to generous immediate payments.

Class members who had been merely exposed to asbestos, but had not yet

developed disease, were not entitled to any benefits.

This settlement is identical to *Amchem*.  The only thing binding the

class together is the fact that all class members have been exposed to head

trauma while playing in the NFL.  A small fraction of the class – less than

17% -- has developed a disease that is associated with head trauma.  The

vast majority of the class has not been diagnosed with any compensable condition.  As in *Georgine*, this raises doubts about the very existence of justiciability and Article III standing, in addition to adequacy of representation.  *Id*. at 617.

In *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3rd Cir. 2012), this Court described its opinion in *Georgine* as follows:

> Our opinion focused in the conflict between class members who already manifested injuries and those who had not yet manifested injuries.  We recognized that class members without manifest injuries would "want protection against inflation for distant recoveries,... sturdy back-end opt-out rights and causation provisions that can keep pace with changing science and medicine, rather than freezing in place the science of 1993."

*Id*. at 182.  The same conflicts are present in this settlement.

Appellants, who have not yet developed a compensable condition caused by head trauma, would prefer not to be included in this class action at all, let alone a robust back-end opt-out right.  Their claims for CTE are premature.  The science surrounding the diagnosis of CTE, especially while a person is living, is, in the words of the district court, "nascent" and "in its infancy." A. 136 - A. 137. Appellant do not want to lock in the science of CTE diagnosis in 2015.  They would prefer to benefit from the advances in CTE diagnosis and treatment that is certain to occur over the next 65 years.

Indeed, there is no reason to include CTE claims in this case at all, other than to provide a bargaining chip for the currently injured players to trade away for enhanced immediate payments to the handful of currently injured players.  The tail is wagging the dog in this upside down settlement.  The vast majority of class members will die with CTE and receive nothing.  Meanwhile, the 5-10% who can qualify for a diagnosis with Parkinson's, ALS or Alzheimers will receive very generous immediate payments, at the expense of the CTE majority.  A. 1570.

Furthermore, those class members who have yet to be diagnosed with a concussion-related disease have suffered no injury caused by the NFL, and therefore cannot allege a claim for damages at this time.  They lack Article III standing to sue the NFL, and therefore may not be included in the settlement class.  *See Amchem*, 521 U.S. at 706 (exposure-only claimants lack standing to sue).  In *Amchem*, the Supreme Court upheld this Court's reversal of class certification on adequacy and predominance grounds, but also noted that if it had not reversed on certification, the jurisdictional and standing issues would "loom larger."  *Id*. at n.15.

**D.    There is No Permissible Basis For The Differential Treatment of Identically Situated CTE Class Members.**

Compounding the lack of adequate representation for those class members who will be diagnosed with CTE post-mortem, the settlement treats players who die with CTE arbitrarily, based solely upon when they die.  Players who die before April 22, 2015 and whose brains show signs of CTE upon autopsy may receive up to $4 million.  Players who die with CTE on April 23, 2015 and thereafter are eligible for nothing.  The Death with CTE payout arbitrarily drops by $4 million in one day.  There can be no justification for such arbitrarily disparate treatment of similarly situated class members.

The only justification for this arbitrary discrimination proffered by the parties prior to the fairness hearing was that making the Death with CTE benefits available to living players would be an inducement to suicide.  The parties had no evidence to support this theory.  It is a theory that presupposes that former NFL players do not have life insurance policies, which would constitute a similar inducement to suicide.  It was also a cynical, dishonest conflation of the suicidality that is one of the symptoms of CTE, and the decision to commit suicide to obtain a monetary benefit.  NFL players who have committed suicide because of CTE did not do so in order to cash in on

their life insurance benefits.  They did it because the other symptoms of CTE had made life unbearable.  Making a monetary payment to the survivors of a CTE victim ensures that the victim's relatives are taken care of after his death.  It does not incentivize suicide.

The parties' initial argument never held much water, however, since extending Death with CTE benefits for the entire 65-year duration of the settlement would provide every former player with assurance that his family would be paid benefits whenever he died.  There would be no arbitrary cutoff when CTE benefits would disappear, thus no urgency to get in under the wire.

Appellants would have to rely on common sense and logic in order to refute this spurious justification, if the parties had not decided to conduct an experiment to test the theory.  In February 2015, undermining their prior justification of the July 7, 2014 cutoff date for Death with CTE benefits, the parties agreed to extend the deadline for Death with CTE until the final approval date.  For the first time ever, the parties created an *actual incentive* for suicide.  They announced a deadline *that had not yet arrived* for the cutoff of Death with CTE benefits.  Any former player who died with CTE before April 22, 2015 is eligible to receive up to $4 million.  Any former player who dies with CTE after that date will receive nothing.  This created,

for the first time, an actual financial incentive for suicide in that there was a looming arbitrary cutoff date *in the future* for Death with CTE benefits, rather than in the past, as was the case with the July 7, 2014 cutoff.

No former NFL player committed suicide between February 2015 and April 22, 2015 in order to cash in on settlement benefits. The parties' readiness to agree to this extension for Death with CTE benefits undermines their previous defense of the arbitrary cutoff date for those benefits, and makes it clear that the July 7, 2014 cutoff date for Death with CTE had nothing to do with a concern about not incentivizing suicide, and everything to do with saving the NFL money. The new arbitrary deadline of the Final Approval Date is similarly unrelated to any rational concern about players' welfare.

The parties' agreement to the amended Death with CTE deadline undermines everything they said prior to that agreement in defense of the original cutoff date, and casts doubt on the need for any cutoff date for Death with CTE benefits. Despite this clear proof of the fallacy of the inducement to suicide rationale, the district court wrote in her opinion that "a prospective Death with CTE benefit would incentivize suicide because CTE can only be diagnosed after death." A. 144.

Faced with the debunking of their initial rationalization of the cutoff date for Death with CTE benefits, the parties came up with a new, more preposterous one: all of the former players who were diagnosed with CTE after their deaths would have been diagnosed with one of the other settlement conditions prior to death, if they had only seen their doctors. Not only is this insulting to the former players, as it assumes that they do not have health insurance, access to medical care or see doctors regularly, but it is absolutely absurd. How could a doctor miss a diagnosis of Alzheimer's, ALS or Parkinson's? These diseases are hardly subtle or easy to miss. The suggestion that all of the former NFL players who were diagnosed with CTE after their deaths were really suffering from Alzheimer's or ALS is outrageous. There is no evidence supporting this assertion.

Moreover, this nascent defense of the indefensible intra-class conflict is inconsistent with Class Counsel's projection about likely claims. Class Counsel has estimated that approximately 3500 of the 20,000 class members will qualify for monetary compensation under the settlement, or approximately 17%. Yet almost *every* former player whose brain was tested *post mortem* was found to have markers of CTE, and will recover under the settlement. How can a 17% chance of qualifying for compensation under the settlement be an adequate "proxy" for a virtually 100% chance of being

diagnosed with Death with CTE?  And how did 33 of the 34 deceased

players whose brains were found to have CTE each have an undiagnosed

compensable disease, when only 17% of the rest of the class is expected to

so qualify?  What was so special about that group of former players?

Clearly, there is no validity to the assertion that every deceased player

diagnosed with CTE would have qualified for some other disease under the

settlement.

While it is certain that the deceased players whose brains contained

tau protein tangles were dealing with serious emotional and behavioral

problems prior to their deaths, that makes them no different from the

hundreds of living former players dealing with the same issues today.

To the extent that a former player who died with CTE may have been

suffering from moderate or early Dementia at the time of his death, the

ability to be diagnosed with Dementia is not an adequate substitute for Death

with CTE benefits.  The district court found that "the compensation provided

for Death with CTE is reasonable because it serves as a proxy for Qualifying

Diagnoses deceased Retired Players could have received while living." A.

136.  But the maximum benefits for Dementia are $3 million for Level 2

Neurocognitive Impairment and $1.5 million for Level 1.5 Neurocognitive

Impairment, in contrast to $4 million for Death with CTE.  A. 1507.

Therefore, the opportunity to be diagnosed with these conditions during one's lifetime is not a proxy for the opportunity to receive a $4 million benefit upon diagnosis with CTE after death.

### E. The Discriminatory Treatment of Class Members Who Die With CTE After April 22, 2015 Requires Reversal.

In *Dewey, supra*, this Court stated that "the structure of the settlement itself, which divides a single class into two groups of plaintiffs who receive different benefits, supports the inference that the representative plaintiffs are inadequate."  681 F.3d at 187.  The two groups in *Dewey* were divided by the model years of the class vehicles.  Older cars were generally treated more favorably than newer ones.  *Id*. at 174-175. Here, the two groups of class members are separated by whether they die before or after April 22, 2015.  There is no principled difference between the two cases.

In *Dewey*, the two adverse groups of class members owned different model year vehicles.   Here, there is *no principled difference* between a class member who died with CTE before April 22, 2015, and one who dies with CTE after that date.  The line-drawing in this case is entirely arbitrary, and justified solely by an illogical and debunked inducement to suicide theory. Even if this theory had some validity, it could not be used to excuse the impermissible and arbitrary line-drawing condemned in *Dewey*.  There is no

principle of class action litigation more firmly enshrined in the law than the proposition that identically situated class members must be treated the same. All class members who die with CTE are identically situated, regardless of date of death.

The principle of equitable distribution requires that similarly-situated class members be treated the same. If deceased class members who were found to have CTE will receive up to $4 million, then all class members who die during the settlement's duration must be eligible for the same payment. An arbitrary cutoff date of April 22, 2015, when compensation drops from $4 million to zero for the same diagnosis, is simply unfair, unreasonable and inadequate as to those class members who are denied compensation, regardless of eligibility for any other qualifying diagnoses.

The fact that the settlement is uncapped is entirely irrelevant. The settlement proposed in *Amchem* was also uncapped: "Although this is not a 'limited fund' case ... the terms of the settlement reflect essential allocation decisions designed to confine compensation and to limit defendants' liability." *Id*. at 627. While the settlement contains no cap on potential payments, a more important ceiling of zero has been placed on all individual class members' claims for death with CTE after April 22, 2015. This will

significantly limit the defendants' liability by hundreds of millions of dollars, rendering the removal of the previous $675 million ceiling all but irrelevant.

The unfairness of the arbitrary limitation on class members' recovery for Death with CTE is magnified by the fact that CTE is the condition that the vast majority of class members are most likely to develop during their lifetimes.  ALS, Parkinson's and Alzehimer's are, thankfully, relative rare diagnoses, and only a small percentage of retired players will ever be diagnosed with one of these conditions.  But neurocognitive impairment, and CTE, are widespread among former players, and the majority of former players suffers from one or more symptoms associated with CTE.  ***98% of all deceased NFL players whose brains were autopsied were found to have signs of CTE.***

### F.    CTE Claims Should Have Been Carved Out Of This Settlement.

 Appellants argued below that there are only two ways to fix the settlement so that it passes muster with *Amchem* and *Dewey*: extend Death with CTE benefits to all class members regardless of date of death, or eliminate CTE claims and releases from this settlement altogether.

The NFL argued at the fairness hearing that CTE research is in its "infancy" compared to the other conditions that are covered.  This is a reason for ***not addressing these claims at all*** in this case, not for releasing

them for no consideration because not enough is currently known to connect CTE to mood and behavior disorders.  The way to do this is to exclude claims for Death with CTE and claims for mood and behavior disorders associated with CTE from the release in this case.  This would leave for another day the question of whether CTE causes these symptoms, rather than resolving those questions for all time against the class members simply because not enough studies have been done to date.

If further research confirms that head trauma leads to depression, rage and executive dysfunction with as much certainty as we now know head trauma causes Parkinson's, the settlement in its current form would preclude any compensation for these class members.  As this Court held in *Dewey*, class members who are not currently suffering from a concussion-related disease do not want to freeze in place what the NFL concedes is immature science on CTE.  It is premature to settle any claims relating to Death with CTE, and especially to settle them for no consideration.

The Release in this settlement currently includes claims

(iii) arising out of, or relating to, neurocognitive deficits
or impairment, or cognitive disorders, of whatever kind or degree, including, without
limitation, mild cognitive impairment, moderate cognitive impairment, dementia,
Alzheimer's Disease, Parkinson's Disease, and ALS; and/or
(iv) **arising out of, or relating to, CTE**

A. 1430.  Thus, this settlement would release all future claims for CTE or
Death with CTE, while providing no compensation whatsoever for those
claims.  There is a failure of consideration for the release of CTE claims.

Indeed, the CTE claims have not been adequately developed in this
lawsuit.  It is premature for any resolution of these claims, which are only
starting to be studied.  Diagnostic techniques may be developed within the
next five years that will allow for the diagnosis of CTE during a person's
lifetime.  Therefore, the class of 20,000 former players should not have their
CTE claims finally resolved for the next 65 years by this lawsuit when the
settlement has failed to adequately develop those claims, and has achieved
nothing for future CTE sufferers.

Carving out the CTE claims would permit the remainder of the
settlement for ALS, Alzheimer's, Parkinson's and dementia to be approved at
this time for the players who have developed or will develop those
conditions.  This would remove the unfairness from the settlement, and
avoid locking in place current medical capabilities for the next 65 years.

If the CTE claims were carved out, the class members who have
already died with CTE could be compensated separately outside of this
settlement.  Indeed, the compensation of Death with CTE claims prior to
April 22, 2015 was an attempt to obscure the abject failure of this case and

settlement to do anything for the thousands of former players who are likely

to develop CTE *and no other qualifying diagnosis* during their lifetimes.

For example, the settlement's compensation of a handful of preexisting

Death with CTE claims was used in the Notice to create the

misrepresentation that Death with CTE claims will be compensated up to $4

million for the next 65 years.  The payments to the 79 or so former players

whose brains have been studied and found to contain tau protein are payoffs

intended to make the NFL's public relations problems go away, not

compensation based upon rational principles meant to make all class

members whole for the problems associated with CTE.  The NFL could still

elect to settle with these players' families outside of this settlement.  It may

not use those players as hostages to extract the ransom of the wholesale

release of all other class members' CTE claims for no consideration, for the

next 65 years.

The parties have failed to make the case for differential treatment of

living and dead class members with tau protein in their brains.   The NFL,

and particularly Class Counsel, should be ashamed of pitting the deceased

class members and living class members against each other in this way.  All

class members, living and deceased, suffer and suffered from CTE.  Each

class member should be treated the same under the settlement.   The date of

death should not matter.  The deceased class members whose brains were found to have CTE did not develop any of the other diagnoses during their lifetimes.  If this does not prevent them from being eligible for a $4 million payment under the settlement, it should not bar living class members either. Only 10% of living class members are expected to be diagnosed with one of the other qualifying diseases, but almost every former player will die with signs of CTE in his brain.  If the science of CTE is too nascent to support recovery at this time, then this settlement should not release CTE claims.

Pursuant to FRAP 28(i), Appellants hereby adopt by reference the Brief of Appellants Jimmie H. Jones, Rickie Ray and Jesse Solomon in Appeal No. 15-2291.

## **CONCLUSION**

For the foregoing reasons, this Court should reverse the district

court's approval of a settlement that suffers from fatal intra-class conflicts

related to CTE.

Appellants Cleo Miller, *et al.,*
By their attorney,


*/s/ John J. Pentz*
John J. Pentz, Esq.
19 Widow Rites Lane
Sudbury, MA 01776
T: 978.261.5725
F: 978.405.5161
jjpentz3@gmail.com

# CERTIFICATION

I, John Jacob Pentz III, hereby certify the following:

(1)     I am a member of the Bar of the Court of Appeals for the Third
        Judicial Circuit.

*/s/ John J. Pentz*
John J. Pentz

# CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(a)(7)(C), I hereby certify that this brief was
produced in Times New Roman 14-point type and contains no more than
6300 words.

I further certify that the electronic copy of this brief filed with the
Court is identical in all respects to the hard copy filed with the Court, and
that the electronic version is virus free as confirmed by the McAfee Security
Scan program.

*/s/ John J. Pentz*
John J. Pentz

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2015 I filed the foregoing Brief via the ECF filing system for the United States Court of Appeals for the Third Circuit, and that as a result each counsel of record received an electronic copy of this Brief on August 17, 2015.

*/s/ John J. Pentz*
John J. Pentz
